UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 17-CV-23184-DPG

L.A., Rivkind & Margulies,
P.A., 66 W Flagler Street,
Suite 700, Miami, FL 33130
Minor, by and through his
mother, natural guardian
and next friend, T.A.,

                                    Miami, Florida
                Plaintiff(s),
                                    May 17, 2018
        vs.

ROYAL CARIBBEAN CRUISES, LTD.,
1050 Caribbean Way,
Miami, FL 33130,

                Defendant(s).      Pages 1 - 24
--------------------------------------------------------------

HEARING
TRANSCRIBED FROM DIGITAL AUDIO RECORDING
BEFORE THE HONORABLE ALICIA M. OTAZO-REYES
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

FOR THE PLAINTIFF(S):   BRUCE M. MARGULIES, ESQ.
                        Rivkind Pedraza & Margulies
                        66 W Flagler Street, Suite 600
                        Miami, Florida 33130
                        (305) 374-0565
                        bmargulies@rivkindlaw.com


FOR THE DEFENDANT(S):   DARREN W. FRIEDMAN, ESQ.
                        Foreman Friedman, P.A.
                        2 S Biscayne Blvd., Suite 2300
                        Miami, Florida 33131
                        (305) 358-6555
                        dfriedman@fflegal.com


TRANSCRIBED BY:         Joanne Mancari RPR, CRR, CSR
                        Court Reporter
                        jemancari@gmail.com

Thereupon,

the following proceedings were held:

(In open court; telephone conference)

THE COURT:  I have something related to medical authorizations and then I got something in the mail about what appears to be the request for information from one of the medical providers.

So where are we?  What do I need to resolve?

MR. FRIEDMAN:  Thank you for your time, your Honor. It is Darren Friedman for the defendant.

For about the last four months, we have been trying to work with opposing counsel to get three things -- signed medical authorizations for the release of records and then a date for the plaintiff to appear for deposition, and IME.

Counsel for the plaintiff has been unwilling to do any of those three things.  His claim to us is that in terms of the deposition and the IME that he believes it will be harmful for the plaintiff to have to appear.  He has not submitted an affidavit from a doctor or anything to that effect, but he has refused to provide dates, and we have been unable to work out any agreement for parameters for those two discovery items.

Then the third item is the medical authorization, and that is what we e-mailed to you today.  That is probably the easiest of the three to work through.

What you have in front of you, in black is the

language that we propose and it is sort of our standard authorization.  What you have in red are the changes that counsel for the plaintiff has asked to be made.  Then the one other change that counsel for the plaintiff asks to be made that is not on here but was sent to us in an e-mail, and that really became the deal breaker at the end, is that counsel for the plaintiff was also insistent that if his client signed any authorization that he gets a copy of whatever comes in from the doctors first, and that he gets then first crack to review what the doctor sent over, just an opportunity to review it, and then it gets sent to us afterwards.

So these three things we simply haven't been able to agree upon.

In terms of the deposition and the IME, plaintiff's mental state is at issue here.  This is a claim concerning a battery between two guests.  He is claiming emotional distress issues, psychological issues.  We have asked for a psychological IME and a deposition.

The case law is exceptionally clear that where emotional distress is put at issue, a party is entitled to an IME.  And the majority rule in federal courts, and I can give you one of a dozen different cases from the Southern District alone, discuss that it's improper for any third party to appear or any limitations or parameters to be put on that which would take away from the examination itself.  And good cause has not

been established for any reason to deviate from that.

Your Honor, I would just point -- I will give you a couple of cases for example.

THE COURT:  I don't need such a long recitation.

MR. FRIEDMAN:  OK.

THE COURT:  Let's get down to business here.

MR. FRIEDMAN:  Sure.

THE COURT:  So you were telling me about the attached release of records and you were talking about red color and all that, and of course we don't have the luxury of color printers here.  So I was trying to find the original thing that you sent me so I could see what you are talking about.

MR. FRIEDMAN:  OK.  Or I can read you the proposed changes.

THE COURT:  That is OK.

MR. FRIEDMAN:  It is probably easier for you to see it.

THE COURT:  Hello.  That's OK.  I can find it.

Let me in the meantime hear from plaintiff's counsel what the situation is with the release of records.

I have never heard of doctors' records going through counsel first on a release of records or subpoena being edited before they get to the requesting party.

What is your basis for demanding that?

MR. MARGULIES:  Judge, Bruce Margulies.  Judge, you

were cutting in and out a little bit.

THE COURT:  Yes.

MR. MARGULIES:  I'm not sure if I'm cutting in and out.

THE COURT:  You are coming through fine.  I'm sorry, but interrupt me if you can't hear me and I will do my best.

MR. MARGULIES:  OK.

THE COURT:  We have been having all kinds of problems with our sound system this week.  Apparently there is some glitch in it.

So go ahead and tell me.

MR. MARGULIES:  Judge, first with regards to medical, you hit -- said it specifically.  You said with regards to subpoenas.  If there was a subpoena of course being issued, we would have notice of the subpoena and have the right to object to certain items.

Here, this is a medical authorization, which the rules really don't -- not that I'm aware of.  There is no rule that says that we have to actually give a medical authorization.  But in the spirit of cooperation we are willing to do so with the parameters we set forth and the changes that we made.

With regards to having to see the records first, in case there is any type of work product or anything that may be contained in the records, we don't know.  There may be.

THE COURT:  Wait.

MR. MARGULIES:  There may be things --

THE COURT:  Hang on.  Work product from a doctor?

MR. MARGULIES:  Well, from a medical expert.  If there is a medical expert that we are utilizing from a doctor, that could be work product.  Meaning not from what his authorities or her authorities are, but if there was anything that was possibly from our office could be work product.

THE COURT:  Hang on just a second.  Mr. Margulies, this authorization -- I pulled it up in living color -- is directed at Johns Hopkins Community Physicians someplace in Maryland, and I'm assuming it's asking for the medical records for the plaintiff.

Am I on the right track so far?

MR. MARGULIES:  Yes, you are.  But --

THE COURT:  So then if this doctor is whoever, are you retaining Johns Hopkins Community Physicians as your expert in this case?

MR. MARGULIES:  They may be experts in this case, yes.  They may be because they are the ones who are treating him.

THE COURT:  What do you mean "they may be?"  The most they would be would be hybrid experts and they would not render a report.

I'm at a loss, honestly, to see where your work product claim for a treating physician is coming from.

MR. MARGULIES:  Well, more importantly than that --

Judge, my partner had sent that e-mail I guess, as far as seeing documents first. Like I said before, there is no rule that requires us to give an authorization, number one.

THE COURT: Well --

MR. MARGULIES: Number two --

THE COURT: Hang on just a second.

You don't want to give the authorization. I'll authorize a subpoena. Which way do you want to go?

MR. MARGULIES: Right. Right. Exactly.

THE COURT: Do you want to go the subpoena route? Is that how you want to do it?

MR. MARGULIES: No. What I'm saying is if they went by subpoena, we would have the right to object to certain things.

THE COURT: I know, but you're agreeing to a release of medical records. So if you are going that route, this is -- I have never seen -- and a release of medical records is just simply a matter of bypassing the trouble of the subpoena.

So I am not going to do this business where you are going to screen the medical records before the defense gets them. So if you want to withdraw your agreement to a release of medical records, I will allow defense counsel to serve a subpoena.

Which way do you want to play it?

MR. MARGULIES: Judge, I would allow the release with

the language, if they would agree to the language that we have provided for in the release.  If they don't, then they can go the subpoena route.

THE COURT:  OK.

MR. MARGULIES:  If they would put the language that we sent them a while ago, and we haven't received a response to, then I would say go the subpoena route.

THE COURT:  All right.  Are you happy with the bold and black and red color and all of that, Mr. Friedman?

MR. FRIEDMAN:  There are a couple of issues.  Really if you look at the first change on schedule A, it is the red stripe-through that the plaintiff asked for.

THE COURT:  Yes.

MR. FRIEDMAN:  I do have an issue with that, where he wants any and all correspondence and record requests and communications, where he wants all of that pulled from the file.  I have a problem with that.

I think the file should be the file without the limitation.

THE COURT:  You want their communications with plaintiff and plaintiff's attorney?  Why?

MR. FRIEDMAN:  Correct.

THE COURT:  Why?  That is not medical records.

I will allow that to be stricken.

What else?  What else?

MR. FRIEDMAN: Your Honor, the reason I might have a concern there, and without being able to see it, is what if, for example, plaintiff's counsel wrote to the doctor saying I need you to tailor your records to say A, B, C, D because that will help us in the litigation.

THE COURT: Listen --

MR. FRIEDMAN: That is not something that would be privileged, it is not work product, and it would be relevant.

THE COURT: Listen, you are asking for medical records. Medical records are medical records. That's what you are getting. If you are not happy with this, you want to go the subpoena route, be my guest. But I think that it's legitimate correspondence with plaintiff's counsel. It's not medical records.

Next.

MR. FRIEDMAN: OK.

THE COURT: What else?

MR. FRIEDMAN: One second. I'm just reading through it one more time to make sure everything else is fine.

I think we are agreeable to everything else.

THE COURT: OK. All right.

MR. FRIEDMAN: I apologize. There is one other thing, your Honor. On the very first change he made, normally parties allow some kind of oral communication with the doctor's office, like do you need to send me an invoice, how much do I have to

pay for photocopies, things like that.

THE COURT:  Yes.

MR. FRIEDMAN:  Plaintiff's counsel wanted to strike that language in here to not allow us to have any communications at all.  I just want to be able to have communications to facilitate their response to the authorization.

MR. MARGULIES:  Judge, can I respond?

THE COURT:  I'm looking for a limited to conversations relating to payments and followup discussions related to status.

OK.  Let me hear from you, Mr. Margulies.

MR. MARGULIES:  The problem we have had in the past is that -- I am not saying it would happen in this particular case -- but that paragraph has been abused in the past where the doctors will get on the phone with the counsel for the defendant and speak to them.  I have had cases just recently, even with this same firm, where the counsel for the defendant knew information before we did as to what was going on -- treatment, followup, followup appointments and such -- which had nothing to do with the medical records.

Here, they are just seeking medical records.

THE COURT:  Right.

MR. MARGULIES:  And that is what the request asks for. So they don't really need oral communications.  They just want

the records.

THE COURT:  Right.  If you need the invoice, you can get it by mail.  All right.  So if you have problems and you need followup, you can work through plaintiff's counsel.

All right.  So I will allow that to be removed and I will allow the other thing on communication between the doctor and plaintiff's attorney to be removed.

Anything else?

MR. FRIEDMAN:  That is all concerning the authorization.

The only other thing I did want to make clear, your Honor, is we intend on sending authorization to all of the treaters, not just John Hopkins.  This was just by way of example.

THE COURT:  OK.  So follow the same pattern for the rest of them.  All right.

MR. MARGULIES:  Then, Judge, by way of your ruling -- and I think, Mr. Friedman, the other items that we had crossed out or added you have agreed to.  Is that correct?

MR. FRIEDMAN:  That's correct.

THE COURT:  All right.

MR. MARGULIES:  OK.  That's fine.

THE COURT:  Then we are getting rid of the screening part.

MR. MARGULIES:  Yes.

THE COURT:  OK.  Done.

So now give me a little bit of background.  How old is the plaintiff?

MR. MARGULIES:  Your Honor, this is Bruce Margulies.

Plaintiff at this time is 16 years old.  He was 13 -- by way of background, he was 13 years old at the time of the incident.  The incident happened on August 16, 2015 on defendant's cruise ship.

What happened was, and there is actually a video of the incident itself, which defendant has produced.  There is a video showing an attack by two men, adults, assailants.  Like I said, there is a video of it.

Like I said, he was 13 years old.  They were both convicted and sentenced and they are both serving time.  One for willful child abuse; the other for lewd and lascivious conduct, false imprisonment, and willful child abuse.

So the defendant took statements of the assailants, which they have asserted as work product in this case.

THE COURT:  I'm sorry.  Hang on just a second.

Were these people crew members or fellow passengers?

MR. MARGULIES:  No.  They were passengers.

THE COURT:  OK.

MR. MARGULIES:  And the incident happened in a public area, in a library.  In a public area.  It wasn't in fact in a cabin or such.

THE COURT:  OK.

MR. MARGULIES:  So now we are talking about the deposition of the plaintiff.  We are asking the court really for some parameters.  He is 13 years old.  He lives in Maryland with his mother.  His mother -- and he is the son of a fallen soldier from Afghanistan, and he is 16 years old.

He would have to, A, travel here to Miami for the deposition.  Now normally under the rules -- I think it's 30(b)(6) if I'm not mistaken -- you travel to where you have brought your lawsuit, and you are required to do that, but that is because the plaintiff -- under the case law that is because the plaintiff chose the forum voluntarily.

THE COURT:  Yes.

MR. MARGULIES:  And the defendant didn't have a chance of selecting the venue, which we don't have in this case.

THE COURT:  So is your issue with the traveling, with the taking of the deposition, with what will be asked at the deposition?  What is your issue?

MR. MARGULIES:  OK.  Yes.  Those are all issues.

With the traveling, coming here, we would request, one, when they do take his deposition that it be done by video conferencing or such to allow him to stay in Maryland; that he have his therapist or somebody in the room just in case questions are asked -- because right now the type of therapy he's getting is he is not being required to relive the incident

because they believe that would be harmful, and he is not ready to relive the incident.  So I think we have to have parameters as to the place of the deposition.  I think they should do it by video conferencing.  If he has to come here, that they have to pay for him to come here because he'd have to come with his mother.

The only reason the suit was brought here was because of the forum selection clause.  He didn't choose the forum.

Then as far as the content of the deposition, they want to get into the background as to what happened beforehand as to why these men attacked my client, which had to do with one of the gentleman's daughters.  When I say gentleman, one of the assailant's -- I take that word back -- assailant's daughter, discussions between my client and her not even on the day of the incident.

So there is no reason -- that wouldn't be a defense to the case.  It is irrelevant.  There is no justification for the attack that occurred to my client, which is on videotape.  So the deposition should be limited to his current, I guess, condition and what he is going through.  But he shouldn't have to relive the incident itself.

It is on video.  It was investigated.  They took statements from the assailants.  They have a statement from his mother and maybe other witnesses.

We're asking that the deposition itself be taken in

Maryland.

THE COURT: I got it. I got it. You told me already what you're asking.

MR. MARGULIES: Yes.

THE COURT: Let me ask Mr. Friedman, what are you seeking in the deposition? You said the reason for it is because there are --

MR. FRIEDMAN: Well --

THE COURT: Hang on just a second. Let me straighten this out.

First of all, you want him to have an IME because -- you want him to have a psychiatric IME because he is claiming mental anguish or whatever, right?

MR. FRIEDMAN: Yes. The entire damages claim is for emotional distress --

THE COURT: Right.

MR. FRIEDMAN: -- and psychological injury.

THE COURT: OK.

MR. FRIEDMAN: Just so you know, your Honor, by way of background, this individual has a significant preexisting history. He has treated with therapists for close to a decade before this injury for other diagnosed mental conditions, and we need an expert to be able to examine him and determine what mental condition actually relates to this action.

THE COURT: OK. So let's say you get the IME for the

mental things.  Now what are you seeking in the deposition?

I know he is the plaintiff, but he was a minor at the time this happened.  So tell me what you are looking for in the deposition.

MR. FRIEDMAN:  Well, I'm looking for a number of things.  Obviously we are looking to examine the damages, how this has impacted him, what effect this has had on his life.  I do think it is also very important to discuss how this injury or how this incident came about.

Plaintiff is attempting to make this out as a negligent security case, sort of a crime of opportunity, that because there was no security in the library this incident was able to occur.

What he is not advising the court of is that the adult who attacked this individual did so because this minor had attacked his daughter, had physically battered his daughter, had tried to solicit money in exchange for sexual intercourse; had physically assaulted her, told her that he was going to steal her virginity, and this adult -- I don't agree with what he did, but what he did in the attack was he was attempting to defend his daughter who was being attacked.

Now, I certainly don't agree with the means in which he went about doing it, but I do think that background is important.  And at trial it would be important for a jury to know all the facts about what took place and why this is not

just a negligent security crime of opportunity, but this is more of a passion crime.

THE COURT: Are you claiming that -- are you having as a defense comparative negligence in any way?

MR. FRIEDMAN: Of course.

THE COURT: All right.

MR. MARGULIES: Judge, could I say, he mischaracterized. When he is saying he was defending her being attacked, the discussion -- and we dispute the facts that he just said as to what occurred.

THE COURT: OK. Hang on. I am going to allow the IME and I am going to allow the deposition. I think that in some fashion the deposition has to be handled carefully so as not to unduly cause distress to the plaintiff, but you all have to come up with some way to do that.

If you are agreeable, Mr. Friedman, to have the therapist present, I will allow that; otherwise, we will have to come up with some other way to make sure that he doesn't go off the rails in the middle of the deposition.

MR. MARGULIES: And also, Judge, I didn't really address the IME itself. That is another thing that we believe, exactly like you said, have the therapist and/or the mother present, and that could be done by video also.

THE COURT: No, no. I'm not allowing video. If they cannot afford to travel here, then I will require that the

defendant advance the cost and it will come out of prevailing, if plaintiff prevails, or it will be added to cost if defendant prevails at the end.

It is going to be in person.  This is too important to do by video.

I am not going to allow the IME to be videoed either. If you have a mental health professional doing the IME, that health professional should be able to know how far he can go. So my only reason for allowing the therapist is obviously lawyers don't know what the trigger points are.  So it has to be in person.

You all choose if you want to pay for it up ahead or if you want the defendant to advance the cost.

Where is the IME going to take place?  Do you have some person down here?  Are you coordinating their travel?

MR. FRIEDMAN:  We do have somebody.  We have retained the director of child and adolescent psychology at the University of Miami to conduct the IME.

THE COURT:  All right.  So you can coordinate so he doesn't have to travel twice.

MR. FRIEDMAN:  Correct.  We will do it all during one trip.

THE COURT:  So do that.  Work out the cost.

What else?

MR. FRIEDMAN:  I have a question about the cost.  I'm

not exactly sure how we determine whether or not the plaintiff can afford it.  I imagine the response will automatically be he can't afford it.

THE COURT:  Well, obviously they are saying that he has a single mother, prior serviceman in Afghanistan.  I suspect they may not be flush with cash.  But let me hear from Mr. Margulies.

MR. MARGULIES:  Yes.  As far as I know, the mother is not even actively employed right now.  They must receive some type of disability from the government.

He was a fallen soldier.  He is 16 years old, my client.  His mother is in school.  She is in school.  They would both have to travel here.

THE COURT:  That is what I imagined.

So that is how we will work that out.  The travel, the cost, the therapist at the deposition, the IME to be handled by the health care provider.

What else do I need to rule on?

MR. FRIEDMAN:  Your Honor, we recently agreed that the therapist can attend the deposition.  I assume we are not responsible for flying the therapist down here.

THE COURT:  If they want the therapist present, they are going to have to figure out a way of paying for the therapist.

MR. MARGULIES:  Or can we have the therapist appear by

some type of Skype or videotape or video conference?

THE COURT:  Yes, you can do that.  You can all work that out.

Anything else?

MR. MARGULIES:  Judge, I just want to be clear.  You said that we should work together regarding the parameters of the deposition.  I'm worried that we're not going to be able to do that.  Getting into -- there wasn't an ongoing attack going on with the daughter as he alleged.

THE COURT:  I am going to allow them to go into all of the circumstances of the event, what happened before the event, what happened during the event.  The therapist will be there to make sure that he does not get unduly, I don't know, off the rails is sort of like the word that comes to my mouth, but unduly stressed so that he doesn't do that.  But they are entitled, the defendants are entitled to find out what happened from the plaintiff.  He is the plaintiff.  He is the one who participated in the event.

So that is my ruling.

I am assuming that defense counsel, who are very experienced, will not do things that are improper and will stay within the rules, not push the kid, not embarrass him, just get the information.  Sergeant Friday.  Just the facts, move on.

MR. FRIEDMAN:  I have one additional request, your Honor.

THE COURT:  Yes.

MR. FRIEDMAN:  We have been asking for these depositions for months, for the deposition of the IME.  Can we put some kind of limit in terms of when they have to give a date?

THE COURT:  What is your discovery deadline?  Here.  I'm looking at it.  You have a discovery deadline of September 21st.  You have the summer to do this in.

Agree on it well ahead of the discovery deadline.  Agreed on the IME.  You are going to have to coordinate a lot because it's going to be one travel for the depo and the IME.  I don't know.  I don't want to give you an arbitrary date, but I would recommend that you try to do it -- the kid is still in school?  Does he go to school?

MR. MARGULIES:  He is 16 years old.  He is in school.

THE COURT:  He is in school, right?

MR. FRIEDMAN:  I will note for everybody, there is a mediation scheduled for July 11th which he already has to fly down here with his mother for.

THE COURT:  So work around that date.  Work around that date.  Have him come before that and do that.  Be smart.  You guys are professionals.  You can do this.

MR. FRIEDMAN:  Your Honor, if I may just note, they had already been ordered to appear down here at their own cost for that mediation.

THE COURT:  All right.  So work it out.  Help with the cost.  Whatever you need to do.

MR. FRIEDMAN:  OK.  Understood, your Honor.  Thank you.

THE COURT:  OK.  Bye.

MR. MARGULIES:  Thank you, Judge.

(Adjourned)

C E R T I F I C A T E


     I hereby certify that the foregoing is an accurate

transcription to the best of my ability of the digital audio

recording in the above-entitled matter.


June 28, 2018          s/ Joanne Mancari
                       Joanne Mancari, RPR, CRR, CSR
                       Court Reporter
                       jemancari@gmail.com